**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**JASON C.,[1]**

        **Plaintiff,**

    **v.**

**FRANK BISIGNANO,[2]**
**Commissioner of Social Security,**

        **Defendant.**

      **Case No. 1:24-cv-6873**
      **Magistrate Judge Norah McCann King**

## OPINION AND ORDER

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Jason C. for Child Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 402 *et seq.*, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Plaintiff appeals from the final decision of the Commissioner of Social Security denying those applications. After careful consideration of the entire record, including the entire administrative record, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court affirms the Commissioner's decision.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to plaintiffs in such cases by only their first names and last initials. *See also* D.N.J. Standing Order 2021-10.

[2] Frank Bisignano, the current Commissioner of Social Security, is substituted as Defendant in his official capacity. *See* Fed. R. Civ. P. 25(d).

1

## I.     PROCEDURAL HISTORY

Plaintiff protectively filed applications for supplemental security income and child's insurance benefits[3] on April 24, 2019, and May 20, 2019, respectively, alleging that he has been disabled since June 30, 2018.[4] R. 142–43, 180–81, 379–92. The applications were denied initially and upon reconsideration. R. 182–91, 197–202. Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ"). R. 203–05. ALJ Trina Moore held a hearing on April 13, 2022, at which Plaintiff appeared without the assistance of counsel along with his mother. R. 87–100. The ALJ continued the hearing to provide Plaintiff another opportunity to obtain a representative. *Id.* The ALJ held a second hearing on March 13, 2023, at which Plaintiff, who was now represented by counsel, testified, as did his mother, Susan M., and a vocational expert. R. 40–86. In a decision dated August 31, 2023, the ALJ concluded that Plaintiff was not disabled

---

[3] Child's insurance benefits are payable to a child "of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual" under certain circumstances. 42 U.S.C. § 402(d)(1)(B). The applicable regulation further explains that an applicant is entitled to such child's benefits if:

> (1) You are the insured person's child, based upon a relationship described in §§ 404.355 through 404.359;
> (2) You are dependent on the insured, as defined in §§ 404.360 through 404.365;
> (3) You apply;
> (4) You are unmarried; and
> (5) You are under age 18; you are 18 years old or older and have a disability that began before you became 22 years old; or you are 18 years or older and qualify for benefits as a full-time student as described in § 404.367.

20 C.F.R. § 404.350(a). In the present case, although he was at the time an adult (born on July 16, 1994, and was 19 years old on the amended alleged disability onset date), R. 20, 31, 386–92, Plaintiff sought, *inter alia*, child's insurance benefits on the earnings record of his father, William John C., Jr., an insured person who was entitled to benefits. R. 5, 20, 142, 181, 466.

[4] Plaintiff later amended the alleged disability onset date to June 1, 2014. R. 20, 45–47, 516, 522.

within the meaning of the Social Security Act from "January 1, 2014,"[5] through the date of that decision. R. 20–32. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on May 6, 2024. R. 1–6. Plaintiff timely filed this appeal pursuant to 42 U.S.C. § 405(g). ECF No. 1. On June 14, 2024, Plaintiff consented to disposition of the matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. ECF No. 3.[6] On January 29, 2025, the case was reassigned to the undersigned. ECF No. 12. The matter is ripe for disposition.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). The United States Supreme Court has explained this standard as follows:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

---

[5] Despite acknowledging on the first page of his decision that Plaintiff had amended his alleged disability onset date to June 1, 2014, R. 20, the ALJ referred to "January 1, 2014," as Plaintiff's alleged disability onset date. R. 22, 32. The Court will assume that the ALJ's references to "January 1, 2014," instead of June 1, 2014, were typographical errors. R. 45–47, 516, 522.

[6] The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision. *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

3

*Biestek v. Berryhill*, 587 U.S. 97, 102–03 (2019) (internal citations and quotation marks omitted); *see also Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309, 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).

The substantial evidence standard is a deferential standard, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484, 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (stating that substantial evidence exists

only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4.  The ALJ's decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although an ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v. Harris*, 650 F.2d 481, 482 (3d Cir. 1981).  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to

scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016

### B.     Sequential Evaluation Process

The Social Security Act establishes a five-step sequential evaluation process for determining whether a plaintiff is disabled within the meaning of the statute. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see also Bruner v. Astrue*, No. 4:11-CV-1359, 2012 WL 5398635, at *4 (M.D. Pa. Nov. 5, 2012) ("In determining whether an applicant for adult child disability benefits and SSI benefits satisfies the definition of disability, the five-step sequential evaluation process outlined in 20 C.F.R. § 404.1520(a)(4) is used."). "The claimant bears the burden of proof at steps one through four, and the Commissioner bears the burden of proof at step five." *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010) (citing *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007)).

At step one, the ALJ determines whether the plaintiff is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the inquiry ends because the plaintiff is not disabled.

At step two, the ALJ decides whether the plaintiff has a "severe impairment" or combination of impairments that "significantly limits [the plaintiff's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c), 416.920(c). If the plaintiff does not have a severe impairment or combination of impairments, then the inquiry ends because the plaintiff is not disabled.  Otherwise, the ALJ proceeds to step three.

At step three, the ALJ decides whether the plaintiff's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1. 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, then the plaintiff is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months. *Id*. at §§ 404.1509, 416.909. Otherwise, the ALJ proceeds to step four.

At step four, the ALJ must determine the plaintiff's residual functional capacity ("RFC") and determine whether the plaintiff can perform past relevant work. 20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f). If the plaintiff can perform past relevant work, then the inquiry ends because the plaintiff is not disabled. Otherwise, the ALJ proceeds to the final step.

At step five, the ALJ must decide whether the plaintiff, considering the plaintiff's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the ALJ determines that the plaintiff can do so, then the plaintiff is not disabled. Otherwise, the plaintiff is presumed to be

7

disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 19 years old on June 1, 2014, his amended alleged disability onset date. R. 22, 31. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between that date and the date of the decision. R. 22.

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: status-post right knee fracture; status-post right knee surgery; obesity; borderline personality disorder; obsessive compulsive disorder; depressive disorder; anxiety disorder; dysthymic disorder; and learning disability. R. 22.  The ALJ also found that the medically determinable impairments of insomnia, irritable bowel syndrome, and urinary retention were not severe. *Id*.

At step three, the ALJ found that Plaintiff did not suffer an impairment or combination of impairments that met or medically equaled the severity of any Listing. R. 23–26.

At step four, the ALJ found that Plaintiff had the RFC to perform light work subject to various additional limitations. R. 26–31. The ALJ also found that Plaintiff had no past relevant work. R. 31.

At step five and relying on the testimony of the vocational expert, the ALJ found that a significant number of jobs–*e.g.*, jobs as a laundry worker, a cleaner, and a price marker–existed in the national economy and could be performed by Plaintiff with this RFC. R. 31–32. The ALJ therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act from the amended alleged disability onset date through the date of the decision. R. 32 (finding also that, based on the application for child's insurance benefits protectively filed on May 20, 2019, Plaintiff was not disabled as defined in section 223(d) of the Social Security Act prior to

July 15, 2016, the date on which Plaintiff attained the age of 22).

Plaintiff disagrees with the ALJ's findings at steps four and five and asks that the decision of the Commissioner be reversed and remanded with directions for the granting of benefits or, alternatively, for further proceedings. *Plaintiff's Memorandum of Law*, ECF No. 6; *Plaintiff's Reply Brief*, ECF No. 11. The Commissioner takes the position that his decision should be affirmed in its entirety because the ALJ's decision correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *Defendant's Brief*, ECF No. 10.

## IV.   SUMMARY OF RELEVANT MEDICAL EVIDENCE

### A.   David Handelman, ED.D.

On September 3, 2016, David Handelman, Ed.D., Plaintiff's therapist and a licensed psychologist, completed a check-the-box, and fill-in-the-blank mental status report form at the request of the State of New Jersey's Department of Labor and Workforce Development, Division of Disability Determination Service. R. 552–57 ("2016 report"). On mental status examination, Plaintiff was alert to person, place, and date; displayed no suicidal or homicidal ideation, psychosis, hallucinations, or delusion; was "[g]enerally anxious, hypervigilant, obsessive with frequent intrusive thoughts"; his behavior was "[g]enerally neat & clean, long beard and hair, cooperative"; his speech rate flow and tone were appropriate; his concentration "[t]ends to be inconsistent"; his memory was "[f]air, difficulty remembering [illegible]"; his intellect was "[a]verage, possible learning disability word [illegible] difficulty"; and his judgment was satisfactory. R. 553; *see also* R. 554 (reporting Plaintiff's mental status during Plaintiff's first visit as "[v]ery anxious, jittery, suspicious, says he is paranoid (worried about being hurt in car when traveling with mother)[.] Cap pulled over head, sunglasses – as if he was trying to hide or

9

appear menacing, which he is <u>NOT</u>") (emphasis in the original). Dr. Handelman noted no reported history of substance abuse. R. 554. Dr. Handelman noted that Plaintiff had panic attacks "when traveling in the car with his mother, he was afraid of being attacked" but that "<u>this is no longer a major concern.</u> Sx – need to escape, hyperventilates, shortness of breath[.]" *Id.* (emphasis in the original). Dr. Handelman addressed Plaintiff's ability to perform "work related mental activities" with checkbox options of "No limitation" or "Limited (please describe below)[.]" R. 555. According to Dr. Handelman, Plaintiff had limited understanding and memory, noting that Plaintiff "[h]as very little recall of teenage years. Forgets what he reads" and a limited ability to sustain concentration and persistence; had "[d]ifficulty sustaining routines for eating, sleeping, and exercise – Has improved past 6-9 months." *Id.* Dr. Handelman did not check any box regarding Plaintiff's ability to engage in social interaction, explaining that Plaintiff "[d]oes not seem to have many friends and rarely socializes[.]" *Id.* Plaintiff had a limited ability to adapt, "[h]as difficulty setting and sustaining goals[.] Does not leave house too much. Afraid to learn to drive[.]" *Id.* Dr. Handelman indicated that he could not "provide a medical opinion regarding this individual's ability to do work-related activities." *Id.* Asked if there were any other conditions that limited Plaintiff's ability to do work related activities, Dr. Handelman responded, "[d]ifficulty falling asleep and/or sustaining sleep. For pas[t] 2 or more years, . . . he sleeps a few hours in the day and a few hours in the evening[.]" *Id.* Dr. Handelman described Plaintiff's daily activities, as follows: "Does not drive, can prepare meals, clean house, do laundry[.] I cannot comment on public transportation or [illegible.]" R. 556. Asked to describe "any other physical/medical impairment[,]" Dr. Handelman referred to "sleeping and bowel problems (which are reportedly improving)[.]" *Id.* He described Plaintiff as "cooperative – panic attacks substant. decreased, has gone to dentist (was very fearful)[.]" *Id.* Plaintiff's

10

prognosis was "guarded[.]" *Id.*

Dr. Handelman completed a second check-the-box, and fill-in-the-blank mental status report form on August 7, 2019. R. 572–78 ("2019 report"). Dr. Handelman had first treated Plaintiff on June 19, 2014, and had most recently treated him on April 24, 2019. R. 573 (noting that treatment was "[e]rratic – sometimes due to finances") (emphasis in original). Dr. Handelman diagnosed borderline personality disorder; "ADHD – inattentive"; and social anxiety disorder, explaining that Plaintiff's symptoms were "unstable moods (not dramatic), inattention, memory difficulties, learning difficulties, social avoidance[, and] sleep difficulties[.]" *Id.* At Plaintiff's most recent visit, Dr. Handelman noted that Plaintiff was alert to person, place, and date with no suicidal or homicidal ideations, psychosis, hallucinations, or delusion. R. 574. He was neat, clean, cooperative with appropriate speech and fair language skills but "can lose focus easily and get derailed" and his long-term memory was "spotty for details[,]" but his short-term memory was "satisfactory[.]" *Id.* His judgment was "fair" and his intellect was "[a]verage, reasoning can be impulsive and can get stuck on certain topics[.]" *Id.* There was no reported history of substance abuse or alcohol use. R. 575. Plaintiff's [p]anic attacks when first seen— thought he and his mother would be attacked when traveling by car. TX [treatment] resolved P.A. [panic attacks]." *Id.* Addressing Plaintiff's ability to perform "work related mental activities" with checkbox options of "No limitation" or "Limited (please describe below)," R. 576, Dr. Handelman indicated that Plaintiff had limited understanding and memory: "will generally forget multi step directions[.]" *Id.* Asked about sustained concentration and persistence "e.g., follow simple or detailed instructions, follows schedules, work with others, follow a reasonable pace, sustain ordinary routine without supervision, maintain customary attendance and punctuality, etc.[,]" Dr. Handelman did not check either box, stating that Plaintiff "[h]as not

worked. In h.s. [high school] learning challenges, probably dyslexia, interfered with school progress. ADHD symptoms[.]" *Id*. Dr. Handelman indicated that Plaintiff had "[n]o limitation" in social interaction, explaining "I cannot speak to interaction with co-workers based on history – social anxiety[.]" *Id*. Plaintiff had a limited ability to adapt: "[h]as some difficulties adapting to change in plans[;] difficulty setting realistic goals[.]" *Id*. Plaintiff had memory and reading comprehension difficulties. Asked if there were any other conditions that limited Plaintiff's ability to do work related activities, Dr. Handelman responded, "Anxiety, sleep difficulties may be limiting factors[.]" *Id*. As to Plaintiff's daily activities, Dr. Handelman stated that Plaintiff "[d]oes not drive or use public transportation despite attempts to have him become more independent[.]" R. 577. Dr. Handelman based his opinion on both mental and physical impairments: "see above psychol. issues. Reportedly has signif arthritis pain in lower extremities[.]" *Id*. As to Plaintiff's medication, Dr. Handelman responded, "unknown at the time. Clear taking Lexapro for anxiety, depression[.]" *Id*. According to Dr. Handelman, Plaintiff's prognosis was fair. *Id*.

> On April 27, 2022, Dr. Handelman summarized his clinical treatment:

> Mr. C[.] began individual and family therapy commencing June 2014 and has been seen periodically and often infrequently. His last appointment was June 7, 2021.

> He was seen for symptoms associated with his diagnoses. He was experiencing panic attacks and was overly suspicious of people. Mr. C[.]'s diagnoses includes a probable borderline personality disorder, major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, a reading learning disability, disorder of sleep wake cycle and degenerative arthritis. He has reported and I have observed his memory lapses or/memory recall difficulties. His memory difficulty may be part of his clinical picture or a separate clinical condition. He has been unsuccessful at part-time work attempts. As of the last appointment he was taking prescribed medications for some of his conditions.

R. 677 ("2022 letter").

> On July 25, 2022, Dr. Handelman completed a five-page, check-the-box, and fill-in-the-

blank form entitled, "Mental Residual Functional Capacity Questionnaire." R. 713–17 ("2022 MRFC opinion"). Dr. Handelman had most recently treated Plaintiff on June 21, 2022. R. 713. Diagnoses were as follows: Axis I: ADHD, predominately inattentive presentation (314.00), generalized anxiety disorder (300.02), unspecified neurodevelopmental disorder (315.9), Asperger's disorder (299.80); Axis II: borderline personality disorder (301.83); Axis III: left blank; Axis IV: "socially isolated"; Axis V: Current GAF 50. *Id.* (noting further that Plaintiff's highest GAF in the prior year was 50). Treatment had consisted of "[i]ndividualized sessions for anxiety redirection, goal setting, improve sleeping pattern[.]" *Id.* Asked to describe the clinical findings that demonstrate the severity of Plaintiff's mental impairment and symptoms, Dr. Handelman responded: "severe anxiety, difficulty maintaining focus, obsessive ideation[.]" *Id.* Plaintiff's prognosis was "fair to poor[.]" *Id.* Dr. Handelman identified Plaintiff's signs and symptoms as decreased energy, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, seclusiveness or autistic thinking, emotional withdrawal or isolation, perceptual or thinking disturbances, emotional lability, illogical thinking, memory impairment – short, intermediate, or long term, and sleep disturbance. R. 714. Addressing Plaintiff's ability to do work-related activities in different types of work on a day-to-day basis in a regular work setting, Dr. Handelman used the following scale: "Unlimited or Very Good"; "Limited but satisfactory"; "Seriously limited, but not precluded" (ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances); "Unable to meet competitive standards" (cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting); and "No useful ability to function" (an extreme limitation, meaning that the person cannot perform this activity in a regular work setting). R. 715. As to the mental abilities and aptitude needed to do unskilled work, Dr.

13

Handelman opined that Plaintiff was seriously limited, but was not precluded in the following areas: remember work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; and ask simple questions or request assistance. *Id*. Plaintiff was unable to meet competitive standards in the following areas: maintain attention for two-hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; and be aware of normal hazards and take appropriate precautions. *Id*. According to Dr. Handelman, Plaintiff had no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms or perform at a consistent pace without an unreasonable number and length of rest periods. *Id*. In explaining these opinions, Dr. Handelman stated that Plaintiff was "[e]asily distracted, moody, often infers negative intent by others[.]" *Id*. As to the mental abilities and aptitude needed to do semiskilled and skilled work, Dr. Handelman opined that Plaintiff was unable to meet competitive standards in understanding and remembering detailed instructions and had no useful ability to carry out detailed instructions, set realistic goals or make plans independently of others, or deal with the stress of semiskilled and skilled work. R. 716. As to the mental abilities and aptitude needed to do particular types of jobs, Dr. Handelman opined that Plaintiff was unable to meet competitive standards in maintaining socially appropriate behavior; adhering to basic standards of neatness and cleanliness; and using public transportation, and had no useful ability to interact

14

appropriately with the general public or travel in unfamiliar places. *Id.* Dr. Handelman also opined that Plaintiff had reduced intellectual functioning, basing that opinion—not on testing—but "on school history, disinterest in reading[.]" *Id.* According to Dr. Handelman, Plaintiff's anxiety exacerbated his experience of pain. *Id.* Dr. Handelman also opined that Plaintiff would be absent from work more than four days per month and his impairment had lasted or could be expected to last at least twelve months. R. 717. His impairments were reasonably consistent with the symptoms and functional limitations described in the doctor's evaluation. Finally, Dr. Handelman stated that Plaintiff limitations had begun, "[b]ased on his history, [in] childhood[.]" *Id.*

> On February 24, 2023, Dr. Handelman again summarized his treatment of Plaintiff:

> Mr. C[.] began individual and family therapy (with his mother) commencing June 2014 and has been seen periodically and often infrequently. His last appointment was June 29, 2022.

> Mr. C[.] was seen for multiple and disabling symptoms associated with his diagnoses. He was experiencing panic attacks and was overly suspicious of people. His diagnoses includes a probable borderline personality disorder, major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, a reading and learning disability, disorder of sleep wake cycle and degenerative arthritis. From the history there is probably an Attention Deficit dHyperactivity [sic] Disorder-Inattentive Type. He has reported, and I have observed, memory lapses or/memory recall difficulties. His memory difficulty may be part of his clinical picture or a separate clinical condition. Mr. C[.] has difficulty maintaining concentration, mood regulation, an autistic style of thinking, and what appears to be an overall maladaptive patterns of behaviors. A formal evaluation for autistic spectrum disorder has not been conducted. He has been unsuccessful at part-time work attempts. As of the last appointment he was taking prescribed medications.

R. 718 ("2023 letter").

### B.    State Agency Reviewing Consultants[7]

Robert Eckhardt, Ph.D., conducted an initial review of Plaintiff's medical record on behalf of the state agency on December 23, 2019. R. 118–25; 133–40, 142. According to Dr. Eckhardt, Plaintiff had moderate limitations in the paragraph B criteria of Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.08 (personality and impulse-control disorders), *i.e.,* Plaintiff was moderately limited in his ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage himself. R. 119, l34.[8] In assessing Plaintiff's mental RFC, Dr. Eckhardt opined, *inter alia*, that Plaintiff was not significantly limited in some areas of functioning, but was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special  supervision; to complete a normal workday or week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness or cleanliness; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. R. 122–24, 137–38.[9]

---

[7] The Court details the opinions of only the state agency psychological consultants, whose opinions are the subject of one of Plaintiff's challenges.

[8] At the time of his review, Plaintiff's alleged disability onset date was June 30 2018, which was after the child benefits period; Dr. Eckhardt found that there was insufficient evidence for CDBR. R. 118, 134. Heather Bradley, Ph.D. affirmed this finding on reconsideration. R. 149, 163.

[9] Plaintiff also points to the opinion and findings of Brian McIntyre, Ph.D., who conducted an

Under the heading "MRFC—Additional Explanation," Dr. Eckhardt explained his opined mental

RFC as follows:

> 25 yr old male, t16 claim, alleging ptsd and other psych issues. No hx of psych hospitalization. He saw psychologist on erratic basis from 6/14 - 4/19. Dx are borderline pd, adhd, and social anxiety disorder. Relates cooperatively with therapist but has social anxiety. 4/19 mental status indicated mood tends to be anxious, sometimes labile. No psychotic sx. No suicidal ideation. He can easily lose focus. Hx of panic attacks but resolved by tx. At psych ce, he described sx of severe anxiety. Mental status was grossly intact No psychotic sx. Mood is neutral. Intellectual functioning appeared low average. Speech is coherent and relevant. Unable to do serial 3s but could recite months of the year backwards. Digit span is 6f and 3b. Delayed recall 1/3. *He retains the ability to understand, remember, and execute simple instructions. CPP diminished by anxiety and decreased focus but is adequate for completing relatively simple tasks. He can adapt to change and adjust to supervision in environments where the emotional demands are modest.* Able to do basic adls with prompting. Anxious travelling alone and needs assistance with money management.

R. 124, 139 (emphasis added).

Heather Bradley, Ph.D., reviewed Plaintiff's medical record upon reconsideration for the

state agency on February 26, 2020. R. 149–50, 153–55, 163–64, 167–69. Dr. Bradley agreed

with Dr. Eckhardt that Plaintiff had moderate limitations in the Paragraph B criteria. R. 150

---

initial review of Plaintiff's medical record on behalf of the state agency on October 11, 2016, apparently in connection with an earlier-filed application. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 8; *see also* R. 30 (reflecting ALJ's consideration of reviewing state agency findings and citing to, *inter alia*, Exhibit 1A), 104–09, 111 (containing Dr. McIntyre's findings and opinions included as part of Exhibit 1A. Plaintiff highlights that, like Dr. Eckhardt, Dr. McIntyre opined that Plaintiff was moderately limited in his abilities to understand and remember detailed instructions, maintain attention and concentration for extended periods, and accept instructions and respond appropriately to criticism from supervisors. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 8  (citing R. 108–09). Plaintiff refers to Dr. McIntyre's opinion that Plaintiff "'may have limitations with understanding and remembering detailed instructions' and 'may struggle to accept instructions and respond appropriately to criticism from supervisors,'" *id*. (quoting R. 108–09), but makes no reference to other portions of Dr. McIntyre's opinion. *See* R. 108 ("Clmt may have limitations with understanding and remembering detailed instructions. *However, clmt can engage in basic simple tasks*.") (emphasis added), 109 ("*Clmt has the ability to interact with the general public*, but may struggle to accept instructions and respond appropriately to criticism from supervisors.") (emphasis added).

(appearing under the heading, "PRT – Additional Explanation"), 164 (same). Dr. Bradley also agreed with Dr. Eckhard that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday or week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to maintain socially appropriate behavior and to adhere to basic standards of neatness or cleanliness; and to respond appropriately to changes in the work setting. R. 153–54, 167–68. However, Dr. Bradley disagreed with Dr. Eckhardt that Plaintiff was moderately limited in his ability to perform activities within a schedule, to maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; and to travel in unfamiliar places or use public transportation, opining instead that Plaintiff was not significantly limited in these areas. R. 154–55, 168–169. Under the heading "MRFC— Additional Explanation," Dr. Bradley explained her opinion as follows:

> A. The claimant is capable of comprehending and remembering uncomplicated vocational instructions, procedures, and systems; although ability to process, encode, and retrieve more sophisticated/detailed occupational information efficiently is probably limited in some measure by the signs/symptoms of the mental impairment.
>
> B. The claimant's capacity to attend and persist for 2-hour intervals while accomplishing job tasks consisting of straightforward, recurring, and uniform steps is not seriously limited by the presence of the mental impairment. However, the signs/symptoms of the mental impairment could cause the claimant to have difficulty maintaining levels of concentration and productivity for skilled work, particularly in work environments requiring multitasking under time pressure.
>
> C. The claimant has the ability to communicate about specific aspects of task-oriented employment and abide by the standards governing basic conduct and appearance that are predominant in many vocational environments. However,

18

adverse emotional and/or behavioral features of the mental impairment may increase the claimant's risk for reacting ineffectively to the stress of extensive customer-service and /or criticism from supervisors.

D. There is no compelling evidence to suggest that the claimant's capacity to appreciate/adhere to occupational safety guidelines, secure transportation to a jobsite, or do basic planning for work  activities is especially limited by mental impairment. However, the claimant's capacity to adjust effectively to abrupt changes in the work schedule /process is likely limited by the mental impairments.

Overall MER and functional evidence indicates that the claimant's mental impairments appear to impose some work related limitations, but do not preclude all work. The claimant is able to meet the mental demands of a simple vocation on a sustained basis, despite the limitations resulting from any impairment.

R. 155–69.

## V.    DISCUSSION

### A.    Opinion Evidence and RFC

Plaintiff argues that the ALJ erred in considering the opinions of Drs. Handelman, Eckhardt, and Bradley. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 13–24; *Plaintiff's Reply Brief*, ECF No. 11, pp. 1–7. This Court disagrees.

For claims filed after March 27, 2017,[10] the Commissioner's regulations eliminated the hierarchy of medical source opinions that gave preference to treating sources. *Compare* 20 C.F.R. §§ 404.1527, 416.927 *with* 20 C.F.R. §§ 404.1520c(a), 416.927c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Instead, the Commissioner will consider the following factors when considering all medical opinions: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating examination, the frequency

---

[10] As previously noted, Plaintiff's claims were filed on April 24 and May 20, 2019.

19

of examinations, and the purpose of the treatment relationship; (4) the medical source's specialization; and (5) other factors, including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." 20 C.F.R. §§ 404.1520c(c), 416.920c(c).

The regulations emphasize that "the most important factors [that the ALJ and Commissioner] consider when [] evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id*. at §§ 404.1520c(a), 416.920c(a). As to the supportability factor, the regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(1), 416.920c(c)(1). As to the consistency factor, the regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id*. at §§ 404.1520c(c)(2), 416.920c(c)(2).

The applicable regulations further require the ALJ to articulate her "consideration of medical opinions and prior administrative medical findings" and articulate in the "determination or decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." *Id*. at §§ 404.1520c(b), 416.920c(b). As previously noted, "[s]upportability and consistency are the most important factors. . . . ALJs need not explain their determinations regarding the other factors, but they must discuss supportability and consistency." *Gongon v. Kijakazi*, 676 F. Supp. 3d 383, 394 (E.D. Pa.

20

2023) (citations omitted); *see also Stamm v. Kijakazi*, 577 F. Supp. 3d 358, 370 (M.D. Pa. 2021) ("Generally, the ALJ may, but is not required to, explain his or her consideration of the other factors, but if there are two equally persuasive medical opinions about the same issue that are not exactly the same, then the ALJ must explain how he or she considered the other factors."). Finally, the ALJ "need not reiterate the magic words 'support' and 'consistent' for each doctor" in order to satisfy the articulation requirements for the supportability and consistency factors, providing that the judge "weave[s] supportability and consistency throughout her analysis of which doctors were persuasive." *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024).

At step four of the sequential evaluation process in this case, the ALJ found that Plaintiff had the RFC to perform a limited range of light work:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional limitations. The claimant can never climb ladders, ropes, or scaffolds, and can never crawl. The claimant can occasionally climb ramps, stairs, balance, stoop, kneel, and crouch. The claimant must avoid all exposure to hazards such as unprotected heights and moving mechanical parts. The claimant retains the ability to carry out simple routine tasks on a continuous basis with simple instructions and simple work-related decisions. The claimant cannot engage in assembly line or production rate pace work. The claimant cannot work in tandem. The claimant can have occasional interaction with co-workers and supervisors. The claimant cannot engage in customer service work. The claimant is able to tolerate few changes in the work setting and work processes.

R. 26. In making this determination, the ALJ considered opinions from, *inter alios*, Dr. Handelman and Dr. Eckhardt. R. 29–30.

### 1.    Dr. Handelman

The ALJ considered, but discounted, Dr. Handelman's opinions, as follows:

> Turning to the opinion evidence, the undersigned has considered the opinion of David Hadelman, Ed.D., indicating that the claimant had limitation in understanding, remembering, or applying information, in concentrating, persisting,

or maintaining pace, and in adapting or managing oneself, and no limitation in interacting with others. He also indicated that he is unable to provide an opinion on work activities. Exhibit 1F [2016 report]; Exhibit 4F [2019 report]. The undersigned has also considered the letters of Dr. Handelman dated in 2022 and 2023. Exhibit 9F; Exhibit 13F. The undersigned does not find these reports persuasive, as they do not specify degree of impairment, making them of limited usefulness.

R. 29.

Dr. Handelman completed an additional report in July 2022. Exhibit 12F. He indicated that the claimant is largely unable to meet competitive standards in mental abilities needed to do unskilled work, and in maintaining socially appropriate behavior, adhering to standards of neatness and cleanliness, and in using public transportation, and that the claimant had no ability to interact appropriately with the general public. The undersigned does not find this opinion persuasive. First, it is not consistent with Dr. Handelman's treatment notes. For example, the claimant sees Dr. Handelman infrequently. In Dr. Handelman's 2019 report at a time when he saw the claimant more frequently, he indicated that he was unable to give an opinion on the claimant's ability to work. Moreover, his findings in the treatment notes reflect that although the claimant sometimes had anxious mood, could lose focus easily, and had a spotty long-term memory, he also found that he was cooperative, that he was neat and clean, that his speech was satisfactory, that his short-term memory was good, and that he had average reasoning. Exhibit 4F. These conclusions are inconsistent with the extreme level of limitation expressed in this July 2022 opinion. Further, his conclusions are inconsistent with the record that show the claimant has little mental health treatment.

Dr. Handelman stated that the claimant has a GAF score of 50.[11] Exhibit 12F. With regard to this GAF score and any other in the record, the undersigned does not find it persuasive. GAF scores are not opinions per se, as they do not equate to a function-by-function assessment of the claimant's remaining mental abilities nor do they measure the claimant's ability to meet the mental demands of work. Similarly, there is no correlation between GAF scores and the paragraph B criteria in the mental disorders listing. Instead, GAF scores are a diagnostic and clinical tool used by clinicians to gauge the claimant's progress in the therapeutic milieu. The undersigned notes that GAF scores are not standardized and are not designed to predict outcomes. Furthermore, without explanation or supporting detail, a GAF score is of little significance. For these reasons, this GAF score is not found to be persuasive.

---

[11] "Diagnostic and Statistical Manual. A GAF score of 50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work)." R. 30.

R. 30. The Court finds no error with the ALJ's consideration in this regard. *See Pierznik v. Comm'r Soc. Sec.*, No. 22-2369, 2023 WL 4014468, at *1 (3d Cir. June 15, 2023) (concluding that substantial evidence supported the ALJ's RFC determination, including his underlying decision to "not adopt" a physician's opinion because they were "'vague' because they 'failed to address specifically [Appellant's] function-by-function abilities in vocational terms'"), *cert. denied sub nom. Pierznik v. O'Malley*, 144 S. Ct. 1035, 218 L. Ed. 2d 190 (2024); *Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 120 n.8 (3d Cir. 2020) ("[A] GAF score provides only a snapshot of a claimant's level of functioning and is an unreliable indicator of a claimant's overall disability status.") (citations omitted); *Koletar v. Kijakazi*, No. 1:21-CV-994, 2022 WL 3598090, at *13 (M.D. Pa. Aug. 23, 2022) (concluding that substantial evidence supported the ALJ's finding a medical opinion not persuasive because "the examination findings of the longitudinal record are not consistent with these rather extreme limitations"); *cf. Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 880 (3d Cir. 2005) ("When 'presented with the not uncommon situation of conflicting medical evidence . . . [t]he trier of fact has the duty to resolve that conflict.'") (quoting *Richardson v. Perales*, 402 U.S. 389, 399 (1971)); *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) (concluding that the ALJ appropriately assigned limited weight to a treating physician's opinion where his "treatment notes, and in particular the treatment notes during the [relevant period], d[id] not support a finding that [plaintiff] was disabled at any time").

Plaintiff, however, raises a number of challenges to the ALJ's consideration of Dr. Handelman's opinions. Plaintiff first complains that the ALJ improperly discounted Dr. Handelman's 2022 MRFC opinion on the ground that Plaintiff's treatment visits were inconsistent. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 16; *Plaintiff's Reply Brief*, ECF No.

11, pp. 2–3. Plaintiff and his mother testified that Plaintiff wanted to see Dr. Handelman more frequently but that he could not do so because of logistical and financial reasons. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 16 (citing R. 53, 69–70). Plaintiff points to Social Security Ruling 16-3p, which "specifically states that the inability to afford treatment must be a consideration in assessing the impact of the Plaintiff's functional limitations." *Id*.

Plaintiff's argument is not well taken. As an initial matter, the Court is not persuaded that the hearing testimony establishes that logistics and finances prevented Plaintiff from obtaining more consistent mental health treatment. Plaintiff testified that he does not see Dr. Handelman as frequently as he would like because his mother drives him and "[s]he has medical issues, she has to work and sometimes it's not in the budget." R. 52–53. Upon examination by Plaintiff's counsel regarding Plaintiff's sporadic treatment with Dr. Handelman, Plaintiff's mother testified as follows:

Q Okay. He started seeing Dr. Handelman in 2014 I believe.

A Yes.

Q Now in Dr. Handelman's notes it says that the treatment has been sporadic or infrequent at times.

A It has been, yeah.

Q Is there a reason for that?

A Usually it's my schedule. I'm the only one that can transport him to these appointments and sometimes -- I do have health issues of my own that I've been contending with the last couple of years so there will be blocks where I'm just  I'm out of commission. I had a knee replacement last year, I was out of commission for three months.

Q  Okay.

A I also have other health issues. You know, this isn't about me so I don't want to get into that but--but I am the only -- I don't really have any extended family left,

so. And Jason's father lives in Maryland and he doesn't really have a whole lot of contact with him.

Q He had mentioned also that sometimes he said it's, quote, not in the budget. Are there -- does he have medical insurance?

A *He does now have medical insurance. Dr. Handelman however is -- he does not work with insurance so there were times where it was not in the budget. And at some point I was letting Jason tell me when he needed to see his doctor.*

R. 69–70 (emphasis added). Thus, transportation and financial difficulties do not fully explain why Plaintiff's treatment with Dr. Handelman was sporadic. Moreover, Dr. Handelman also stated that the "erratic" nature of Plaintiff's treatment was only "<u>sometimes</u> due to finances[.]" R. 573 (emphasis in the original). In short, Plaintiff's sporadic treatment with Dr. Handelman was due at least in part to Plaintiff's own choice. In any event, Plaintiff has not pointed to any evidence or explanation in the record as to why he did not seek out different or additional mental health treatment with a provider who accepted Plaintiff's insurance. Under these circumstances, the Court cannot conclude that the ALJ erred when discounting Dr. Handelman's 2022 MRFC opinion in part due to Plaintiff's sporadic treatment with that provider.

Plaintiff next insists that, contrary to the ALJ's characterization, Dr. Handelman's treatment notes are consistent with that provider's opinions. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 16–17. Plaintiff argues that he "need not demonstrate at every medical visit that he suffers deficits in every area of mental function" and points out that the ALJ conceded that Dr. Handelman noted that Plaintiff presented as anxious with deficits in attention and concentration. *Id.* (noting further that Dr. Handelman identified "clinical bases" for his 2022 MRFC opinion, including social anxiety, difficulty maintaining focus, and obsessive ideation) (citing R. 713). Plaintiff's argument is not well taken. As noted above, the ALJ, as the trier of fact, has the duty to resolve conflicting medical evidence. *See Hatton*, 131 F. App'x at 880. Here,

25

the ALJ expressly acknowledged Dr. Handelman's conflicting findings and resolved that conflict when she found that this provider's extreme opined limitations were inconsistent with findings that Plaintiff was, *inter alia*, cooperative, neat, and clean and had satisfactory speech, good short-term memory, and average reasoning. R. 30. Plaintiff has not persuaded the Court that the ALJ erred in this consideration.

Plaintiff also insists that Dr. Handelman's opinions were consistent with other substantial evidence in the record, *i.e.,* the findings and diagnoses of different consultative examiners. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 17–18 (citations omitted); *Plaintiff's Reply Brief*, ECF No. 11, p. 4. Plaintiff's argument is not well taken. His insistence that the Court find evidence—which the ALJ expressly considered at step four, R. 28–30—sufficient to support Dr. Handelman's extreme opinions boils down to a request that this Court reweigh the evidence, a request that this Court must deny. *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011) ("Courts are not permitted to reweigh the evidence or impose their own factual determinations [under the substantial evidence standard]."); *see also Hatton*, 131 F. App'x at 880.

In any event, Plaintiff has not shown that this evidence undermines the ALJ's consideration of Dr. Handelman's extreme opinions or otherwise militates a different result. For example, Plaintiff highlights the consultants' diagnoses, *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 17–18 (citations omitted), but "[a] diagnosis alone . . . does not demonstrate disability." *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) (citing *Petition of Sullivan*, 904 F.2d 826, 845 (3d Cir. 1990)); *see also Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("[The claimant's] argument incorrectly focuses on the diagnosis of an impairment rather than the functional limitations that result from that impairment. A diagnosis of

impairment, by itself, does not establish entitlement to benefits under the Act"). Similarly, a consultative examiner's characterization of Plaintiff's mental impairments as "severe" is not determinative where, as previously discussed, the ALJ in fact found at step two of the sequential evaluation that Plaintiff suffered from the severe impairments of, *inter alia*, borderline personality disorder; obsessive compulsive disorder; depressive disorder; anxiety disorder; dysthymic disorder; and a learning disability, and continued to consider those severe mental impairments throughout the sequential analysis. R. 23–32; *see also Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 209 (3d Cir. 2019) (explaining that "no incantations are required at steps four and five simply because a particular finding has been made at steps two and three. Those portions of the disability analysis serve distinct purposes and may be expressed in different ways" and, therefore, "the findings at steps two and three will not necessarily translate to the language used at steps four and five").

In addition, Plaintiff does not point to any specific functional limitations opined by these consultative examiners, much less to any such limitations that are consistent with Dr. Handelman's extreme opinions. *See Plaintiff's Memorandum of Law*, ECF No. 6, pp. 17–18 (citations omitted); *Plaintiff's Reply Brief*, ECF No. 11, p. 4. For example, Plaintiff notes that Robert J. Waters, Ph.D., found that Plaintiff, *inter alia*, "demonstrated mixed attention and was unable to perform simple calculations" and had "deficiencies in . . . concentration and his social and test judgment" as well as "deficiencies in memory." *Plaintiff's Memorandum of Law*, ECF No. 6, p. 17 (citing R. 560–61). However, the ALJ specifically considered these deficiencies but explained that Dr. Waters' opinion was not persuasive because it "does not specify degree of impairment, making it of limited usefulness." R. 29.[12]

---

[12] The ALJ's consideration reads in total as follows:

Plaintiff's reliance on the opinion of Nakia Perry-Goffney, Psy.D. is similarly unavailing. According to that consultant, the record documented deficiencies in mental recall, spelling, and calculations and the consultant opined that Plaintiff "*may* need assistance managing benefits and that he *may* need additional clarification for multistep instructions." *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 17–18 (citing R. 589–90) (emphasis added). However, the ALJ explained that she considered this evidence and found Dr. Perry-Goffney's opinion to be only somewhat persuasive:

> The claimant was evaluated by consultative examiner, Nakia Perry-Goffney, Psy.D., in December 2019. Exhibit 6F. Upon mental status examination, the claimant could not do a simple calculation and he was estimated to be of below average intelligence, but his eye contact was good, his mood was neutral, he was dressed appropriately, and he was able to correctly answer all of the examiner's questions other than the math question. He had no delusions or hallucinations and

> The claimant was also evaluated by Robert Waters, Ph.D., in October 2016. Exhibit 2F. The claimant complained of anxiety, of being teased by other students, shortness of breath, and a feeling of dread, but he described his depression as mild. Exhibit 2F/1. On mental status examination, he reported stuttering in social situations, his attention was mixed, his concentration was deficient, and he could not do a simple multiplication problem. However, examination also showed that the claimant's speech was coherent, he made adequate eye contact, he was fully oriented, he had no suicidal ideation, his appetite and interest in activities was good, he had no hallucinations or delusions, his fund of knowledge was good, he was estimated to be functioning at an average intellectual level, his reasoning was good, and his memory was generally intact. Exhibit 2F. The claimant was diagnosed with social phobia and dysthymic disorder. Exhibit 2F.

R. 28.

> The undersigned has considered the opinion of Dr. Waters. Exhibit 2F. Dr. Waters indicated that the claimant's severe limitations are due to his mental status rather than physical, that his most significant obstacles are due to depression and anxiety, and that his attention deficit presents an additional impediment. However, Dr. Waters did indicate that the claimant could manage his own benefits. The undersigned does not find this opinion persuasive, as it does not specify degree of impairment, making it of limited usefulness.

R. 29.

28

denied suicidal ideation. The claimant was diagnosed with generalized anxiety disorder and major depressive disorder. Exhibit 6F.

R. 28

The undersigned has considered the report of consultative examiner, Nakia Perry-Goffney, Psy.D., indicating that the claimant needs assistance with completing activities of daily living, but that he is able to follow simple and multistep instructions, although he may need clarification for multistep directions. Exhibit 6F.[13] The undersigned finds this opinion only somewhat persuasive. First, the degree of assistance needed with completing activities of daily living is unclear as there is no indication of the degree or frequency of any proposed assistance needed. As for his ability to follow simple instructions, the undersigned had accommodated his limitation in the residual functional capacity. There is no other evidence to support any more limitation.

R. 29–30. In other words, to the extent that this consultant's opinion was not vague and unquantified, the ALJ found persuasive Dr. Perry-Goffney's opinion that Plaintiff could follow simple instructions and included that limitation in the RFC. R. 26, 29. Based on this record, Plaintiff has not shown that Dr. Perry-Goffney's opinion undermined the ALJ's discounting Dr. Handelman's extreme opinions.

Plaintiff goes on to argue that the findings of consultative examiner Lewis Lazarus, Ph.D., support Dr. Handelman's opinions. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 18. Again, Plaintiff first points to that examiner's diagnoses, which this Court has already explained does not establish any functional limitations. *Id*. (citing R. 680); *see also Foley*, 349 F. App'x at 808; *Phillips*, 91 F. App'x at 780. Plaintiff notes that Dr. Lazarus characterized Plaintiff's manner of relating and social skills as limited; his grooming was only "fair to poor"; his posture was slouched and his motor behavior was lethargic; he had "generally quite poor" eye contact; his affects was flat; and his prognosis was guarded; the examiner recommended that Plaintiff

---

[13] Dr. Perry-Goffney opined that Plaintiff "needs assistance with completing ADL's[,]" and that Plaintiff "may need assistance managing his benefits. Claimant is able to follow simple and multistep instructions, may need additional clarification for multistep directions." R. 589–90.

consider engaging in specialized programs and believed that Plaintiff would not be able to manage his own funds. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 18 (citing R. 679–80). However, nowhere does Plaintiff explain how these generalized findings and recommendations support or otherwise contradict the ALJ's consideration of Dr. Handelman's extreme opinions. *See id.*; *see also Plaintiff's Reply Brief*, ECF No. 11, p. 4.[14]

Finally, Plaintiff argues that his education records, dating back to 1999, are consistent with Dr. Handelman's opinions. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 18–19 (citing R. 685–86, 702, 704–07, 710–11). Plaintiff has not persuaded this Court that school records, dated more than 14 years before the alleged disability onset date of June 1, 2014, undermine the ALJ's consideration of Dr. Handelman's opinions. While the ALJ might consider this evidence, *see Louis v. Comm'r Soc. Sec.*, 808 F. App'x 114, 120 (3d Cir. 2020) (citing *Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007); 20 C.F.R. § 416.912), this evidence was not entitled to controlling or, indeed, any particular weight. *Id.* at 120 (finding that the ALJ "was entitled to discount" an opinion letter where the opinion was written before the claimant's application date and alleged disability onset date and where the opinion was inconsistent with the medical record); *Dennis-Orshak v. Berryhill*, No. 3:18-CV-15987, 2020 WL 4364330, at *4 (D.N.J. July 30, 2020) (finding that the ALJ did not err in giving no weight to a report that predated the alleged disability onset date). Here, the ALJ acknowledged that "[t]here are also education records in the

---

[14] The ALJ appropriately did not evaluate the persuasiveness of Dr. Lazarus' report because it "did not offer an opinion as to degree of function." R. 29; *see also* 20 C.F.R. §§ 404.1513(a)(2) (defining "medical opinion"), 416.913(a)(2) (same); *Scheel v. Comm'r of Soc. Sec.*, No. CV 20-5077, 2021 WL 4477163, at *4 (E.D. Pa. Sept. 30, 2021) ("Dr. Shipkin's letter does not qualify as a medical opinion that the ALJ was required to evaluate. Indeed, Dr. Shipkin never opined on Scheel's functional limitations or what activities she could or could not perform in a work setting, or otherwise articulated Scheel's work-based limitations. Accordingly, Dr. Shipkin's letter does not contain an 'opinion' as defined in the regulations.").

file dates as late as 2000 but these records are dated many years before the alleged onset date, making them of limited usefulness. Exhibit 11F." R. 27. The Court finds no error with the ALJ's finding in this regard. *See Louis*, 808 F. App'x at 120.

Plaintiff's insistence that the ALJ improperly cherry picked the school evidence is not well taken. Plaintiff complains the ALJ cited to the school records to show Plaintiff's improvement during a school year, but did not discuss multiple instances of emotionality and inappropriate behavior in those records. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 20–24 (citing R. 26[15]–27, 685–86 (containing school records from 2000), 702 (containing school records from 1999), 704–07 (containing school records from 1999 and 2000), 710–11 (containing school records from 2000)); *Plaintiff's Reply Brief*, ECF No. 11, pp. 6–7. It is true that, at step three of the sequential evaluation, the ALJ twice cited to school records reflecting that Plaintiff had improved and was a pleasure to teach, and the ALJ referred to the same record when crafting the RFC. R. 24 (citing Exhibit 7F/4, R. 594, containing a school record from 2012), 25 (same), 27 (same). However, unlike Plaintiff's cited school records—which as noted are dated 14 or more years before the alleged onset date—the 2012 school records cited by the ALJ were generated much more closely to June 1, 2014, *i.e.*, plaintiff's alleged disability onset date. The Court does not find that the ALJ engaged in prohibited cherry picking when she considered Plaintiff's school records. *See id.*; *Louis*, 808 F. App'x at 120.

For all these reasons, the Court concludes that the ALJ properly considered Dr. Handelman's extreme opinions in accordance with the applicable regulations and that her evaluation of those opinions enjoys substantial support in the record.

---

[15] There is no reference to the school records on R. 26.

2.      **Drs. Eckhardt and Bradley**

In crafting the RFC, the ALJ expressly considered the opinions of the state agency

reviewing mental consultants, including those of Drs. Eckhardt and Bradley:

> The undersigned has also considered the opinion of the State Agency medical and
> mental health professionals opining in the Title 16 matter that the claimant can do
> medium work and had mild to moderate mental limitations, and that the Title 2
> claim is denied. Exhibit 1A; Exhibit 2A; Exhibit 3A; Exhibit 6A; Exhibit 7A;
> Exhibit 8A. The undersigned does not find the opinion of medium work persuasive,
> as the record better supports a finding of light work. For example, on examination
> by Dr. Woloszyn, the claimant had reduced flexion of the hip, knee, and ankle, and
> x-ray confirmed that the claimant was status-post right knee fracture and status-
> post open reduction and internal fixation with bone graft and hardware. Exhibit 5F.
> Moreover, the examiners failed to consider the exacerbating effects of the
> claimant's obesity. As for mental impairment, the undersigned finds the opinion of
> no more than moderate impairment persuasive. For example, the claimant has little
> recent mental health treatment, and mental health treatment in the past showed no
> more than moderate findings. For example, Dr. Handelman found that although the
> claimant sometimes had anxious mood, could lose focus easily, and had a spotty
> long-term memory, he also found that he was cooperative, that he was neat and
> clean, that his speech was satisfactory, that his short-term memory was good, and
> that he had average reasoning. Exhibit 4F.

R. 30–31.

Plaintiff argues that, although the ALJ found the opinions of Drs. Eckhardt and Bradley

persuasive, she failed to include all their opined limitations in the RFC and did not explain that

omission. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 20; *Plaintiff's Reply Brief*, ECF No.

11, pp. 5–6. Plaintiff specifically argues that Dr. Eckhardt found Plaintiff to be at least

moderately limited in his abilities to perform activities within a schedule, maintain regular

attendance, be punctual within customary tolerances, sustain an ordinary routine without special

supervision, and complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable

number and length of rest periods, and that Dr. Bradley similarly found that Plaintiff was

moderately limited in his abilities to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 20 (citing R. 122–24, 137–39, 153–55, 167–69); *Plaintiff's Reply Brief*, ECF No. 11, p. 5 (same). Plaintiff contends that related RFC functional limitations "would likely be reflected in off-task behavior, absenteeism, or even in the number of days per month that the Plaintiff would be late or leave early from work, etc. Again, a reflection of the inability to maintain attendance, keep a schedule, be punctual, and remain on task." *Plaintiff's Reply Brief*, ECF No. 11, p. 5; *see also Plaintiff's Memorandum of Law*, ECF No. 6, p. 20 ("[T]he ALJ failed to include any discussion in the RFC finding regarding the amount of time the Plaintiff would be off-task or absent from work due to symptoms."). Plaintiff reasons that, although the ALJ need not adopt every limitation from opinions found to be persuasive, she must nevertheless explain any omission and her failure to do so leaves the Court unable to follow her reasoning. *Plaintiff's Memorandum of Law*, ECF No. 6, p. 20; *Plaintiff's Reply Brief*, ECF No. 11, p. 6.

The Court is not persuaded that this issue requires remand. As an initial matter, the moderate limitations that Plaintiff highlights appear in the worksheet portion of the state agency opinions, which is not the operative portion of those opinions, *i.e.*, not the actual opinion regarding the Plaintiff's RFC. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 636 (3d Cir. 2010) ("'Section I is merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and *does not constitute the RFC assessment*.'") (emphasis in the original) (quoting POMS DI 24510.060, *available at* https://secure.ssa.gov/apps10/porns.nsf/lnx/0424510060); R. 122 ("The questions below help determine the individual's ability to perform sustained work activities. *However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which*

33

*describes how the evidence supports each conclusion*. This discussion(s) is documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation). Any other assessment information deemed appropriate may be recorded in the MRFC - Additional Explanation text box.") (emphasis added), 137 (same), 153 (same), 167 (same); *cf. Wise v. Comm'r of Soc. Sec.*, 626 F. App'x 357, 360 (3d Cir. 2015) ("But we have said that ALJs are not required to give any weight to these fill-in-the-blank and checklist portions of RFC assessments and that their focus instead should be on the narrative portions of the assessments where the medical experts expound on their opinions.") (citations omitted). The ALJ therefore had no obligation to include in the RFC any of the moderate limitations contained in the worksheet. *Id*.

Moreover, in finding Plaintiff is moderately limited in his abilities to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, Consultants Eckhardt and Bradley expressly referenced their narrative discussions under the heading, "MRFC – Additional Explanation." R. 122–24, 137–39, 153–55, 167–69 (referring to "see below" when asked to explain in narrative form the limitations and/or capacities in these areas). In that narrative explanation, as detailed above, Dr. Eckhardt found that Plaintiff "retains the ability to understand, remember, and execute simple instructions. CPP diminished by anxiety and decreased focus, but is adequate for completing relatively simple tasks[,]" and "can adapt to change and adjust to supervision in environments where the emotional demands are modest." R. 124, 139. After detailing her findings in the narrative explanation, Dr. Bradley similarly found

34

that Plaintiff "is able to meet the mental demands of a simple vocation on a sustained basis[.]" R. 155 (finding further that Plaintiff "is capable of comprehending and remembering uncomplicated vocational instructions, procedures, and systems"; his "capacity to attend and persist for 2-hour intervals while accomplishing job tasks consisting of straightforward, recurring, and uniform steps is not seriously limited by the presence of the mental impairment"; "has the ability to communicate about specific aspects of task-oriented employment and abide by the standards governing basic conduct and appearance that are predominant in many vocational environments"; and that there "is no compelling evidence to suggest that the claimant's capacity to appreciate/adhere to occupational safety guidelines, secure transportation to a jobsite, or do basic planning for work activities is especially limited by mental impairment"), 169 (same). Stated differently, Consultants Eckhardt and Bradley detailed and explained in the narrative discussion the parameters of Plaintiff's mental functional limitations. *See id*. The ALJ accommodated these limitations by restricting Plaintiff to carrying out simple routine tasks on a continuous basis with simple instructions and simple work-related decisions; no assembly line or production rate pace work; no tandem work; occasional interaction with co-workers and supervisors, but no customer service work; and few changes in the work setting and work processes. R. 26; *cf. Hess*, 931 F.3d at 210 ("A limitation to 'simple tasks' is fundamentally the same as a limitation 'to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]'") (citations omitted); *Menkes v. Astrue*, 262 F. App'x 410, 412–13 (3d Cir. 2008) ("The term 'simple routine tasks,' in the context of the disability proceedings, generally refers to the non-exertional or mental aspects of work. For example, performing a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration.").

At bottom, substantial evidence supports the ALJ's consideration of the opinions of Drs. Handelman, Eckhardt, and Bradley, as well as the ALJ's RFC determination.

### B.    Step Five

Plaintiff challenges the ALJ's determination at step five of the sequential evaluation where she found that Plaintiff could perform jobs that existed in significant numbers in the national economy, namely, laundry worker, cleaner, and price marker. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 24–26; *Plaintiff's Reply Brief*, ECF No. 11, pp. 7–8; *see also* R. 31–32. At step five, an ALJ must decide whether the claimant, considering the claimant's RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). Unlike in the first four steps of the sequential evaluation, the Commissioner bears the burden of proof at step five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005)). "'Advisory testimony from a vocational expert is often sought by the ALJ for that purpose [of determining whether other jobs exist in significant numbers in the national economy that the claimant could perform] . . . and factors to be considered include medical impairments, age, education, work experience and RFC.'" *Id*. at 205–06 (quoting *Rutherford*, 399 F.3d at 551).

In this case, Plaintiff argues that the ALJ erred at step five because she failed to identify and resolve an obvious conflict in the vocational expert's testimony. *Plaintiff's Memorandum of Law*, ECF No. 6, pp. 24–26 (citing, *inter alia*, R. 79, 83–84); *Plaintiff's Reply Brief*, ECF No. 11, pp. 7–8 (same). According to Plaintiff, the vocational expert initially testified that Plaintiff could perform three unskilled jobs that required, *inter alia*, occasional contact with coworkers and supervisors. *Id*. Upon cross-examination, however, the vocational expert admitted that all three

jobs require a probationary period that would expose Plaintiff to greater than occasional interaction with coworkers and supervisors. *Id*. Plaintiff points out that the vocational expert went on to testify that an individual unable to sustain more than occasional contact would not be able to sustain the probationary period, and, in turn, keep the job. *Id*. Plaintiff therefore contends that the three jobs identified by the vocational expert and relied upon by the ALJ exceed the RFC and that the ALJ failed to address and resolve this conflict. *Id*.

Plaintiff's argument is not well taken. The hypothetical question posed by the ALJ to the vocational expert assumed a claimant with Plaintiff's vocational profile and the RFC found by the ALJ. R. 26, 78–80. The vocational expert responded that the unskilled jobs of laundry worker, cleaner, and price marker could be performed by such an individual. R. 79–80. The vocational expert went on to confirm that his testimony was consistent with the Dictionary of Occupational Titles (and its companion, the Selected Characteristics of Occupations) except those areas where he relied on his education and experience. R. 82. This exchange with the vocational expert then followed upon examination by Plaintiff's counsel:

> Q Okay. The jobs that you cited are all unskilled, I assume you've placed people in the unskilled job market?
>
> A Yes.
>
> Q What's the period of time typically that a person – what's a typical probationary period let's call it for a person first learning the job?
>
> A Could you repeat that question? I apologize, I did have some difficulty hearing the full question.
>
> Q Sure. How long does a typical probationary period last in the unskilled job?
>
> A Typically 30, 30 to 60 days for an employee especially for the types of occupations provided. The job tasks are learned within a short demonstration up to 30 days, up to 30 days but the probationary period could last about 30 to 60 days.

37

Q Okay. And during that time where a person's first learning the job is it fair to assume that they're paired up with a coworker or supervisor who's going to show them the job tasks?

A Yes, I would agree to that.

Q And that the level of contact during that particular time, that can exceed the occasional level, can it not?

A Yes, it could.

Q And if an individual is unable to interact more than occasional that person's not going to sustain the probationary period, is that fair to say?

A Yes, it can be. If the -- when a new hire comes into a new position they're going to have to  learn the job tasks in addition to the employer's policies and procedures. And a new hire is going to be expected to maintain appropriate interactions to learn their job tasks before they're working independently during the work day.

ATTY: Thank you. That's all I have, Your Honor.

R. 83–84. Upon reexamination by the ALJ, the vocational expert further explained his testimony

regarding the probationary period:

 BY ADMINISTRATIVE LAW JUDGE:

Q The jobs that you mentioned, would any of those jobs --would they require a probationary period that is incompatible with the hypothetical questions with the occasional interaction with coworkers and supervisors, and no customer service work, and few changes in the work setting and work processes, or occasional changes in the work processes and work setting during the --

A Your Honor --

Q  --probationary period?

A    Your Honor, I would think that during the probationary period for any occupations in the -- any occupation in the national economy especially for these positions. *These positions are performed primarily independently and meet all the limitations of the hypothetical.* During the probationary period it'd be more just from the employee that's just hired learn the job tasks and occupations in the national economy may be more than occasional interaction just for that first shift or two just so they have an understanding of what they're performing for the job tasks and also understanding the procedures and policies after the employer that

38

they're working with. So in any occupation that may exceed occasional for that first shift or two until they're able to work independently.

Q But you wouldn't anticipate that the probationary period to learn the job or to be given instructions as to how to perform the job, would that last for 30 to 60 days?

A Your Honor, for these positions the essential job tasks especially for the unskilled occupations can be learned within a short demonstration and the individual may be independent after that first shift or second shift but the 30 to 60 days wouldn't be increased interactions that whole entire time. That would just be monitoring them just to make sure that they're doing their job tasks efficiently for their scheduled shift for that new hire and just ensuring that they're maintaining appropriate attendance during that time period but the -- that 30 to 60 days wouldn't exceed the social interactions each day. That would just be more for the -- you know, their initial hiring date and their first shift or second shift just to make sure that they have an understanding of what they're doing.

R. 84–85 (emphasis added). Thus, the vocational expert clarified that the three jobs identified by

him did not exceed the RFC and in fact met "all the limitations of the hypothetical." R. 84.

Based on this record, there was no conflict that the ALJ had a duty to address. Accordingly, the

Court concludes that remand is not required on this basis.

## VI.    CONCLUSION

For these reasons, the Court **AFFIRMS** the Commissioner's decision.

The Court will issue a separate Order issuing final judgment pursuant to Sentence 4 of 42

U.S.C. § 405(g).

**IT IS SO ORDERED.**

Date:  March 26, 2026                                            *s/Norah McCann King*
                                                          NORAH McCANN KING
                                                          UNITED STATES MAGISTRATE JUDGE